IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| ALICE S. JONES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:13-CV-0054 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| Acting Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

**REPORT AND RECOMMENDATION**
**TO AFFIRM THE DECISION OF THE COMMISSIONER**

Plaintiff ALICE S. JONES brings this cause of action pursuant to 42 U.S.C. § 405(g),

seeking review of a final decision of defendant CAROLYN W. COLVIN, Acting Commissioner of

Social Security (Commissioner), denying plaintiff's application for disability benefits.  Both parties

have filed briefs in this case.  For the reasons set out below, the undersigned United States

Magistrate Judge recommends the Commissioner's decision finding plaintiff not disabled from

January 9, 2008 through June 30, 2009, and not entitled to disability benefits be AFFIRMED.

I.
STATEMENT OF THE CASE

The relevant time period in this case is January 9, 2008, plaintiff's alleged onset date of

disability, through June 30, 2009, the date plaintiff was last insured.

Between April 2005 and July 2011, plaintiff presented to the Childress Regional Medical

Center (CRMC) with complaints of, *inter alia*, nausea, vomiting, abdominal pain, ankle sprain,

hand burns while cooking, and sleep apnea.  (Tr. 403-61, 463, 465-583, 588, 602-03).  Plaintiff was

seen by Dr. Thomas Craig Darter at the CRMC on three (3) occasions:  April 2005, May 2008, and

June 2010.  (Tr. 403-47, 453-61, 519-27).

Between September 2009 and November 2011, plaintiff presented to the Fox Rural Health

Clinic in Childress, Texas with a variety of complaints, but primarily with complaints of upper

respiratory ailments, headaches, gastrointestinal issues, chest pain, earaches, physical injury, fatigue,

and for Coumadin level checkups.  (Tr. 345-99, 585-87, 589-601, 604-09, 620-22).  Plaintiff was

seen by Dr. Darter at the Fox Rural Health Clinic on three (3) occasions:  May, July and September

2011.[1]  (Tr. 592-94, 604-06, 607-09).

In January 2008, plaintiff was referred to the Amarillo Diagnostic Clinic for a cardiac

evaluation prior to bunion surgery on her left foot.  (Tr. 291-93).  Plaintiff reported prior diagnoses

of angina, left lower extremity phlebitis,[2] left upper extremity paresis, and pulmonary embolus.[3]

Plaintiff was found to be asymptomatic from a cardiovascular standpoint.  Testing revealed

evidence of an old deep vein thrombosis (DVT) in plaintiff's left leg, mild venous insufficiency in

plaintiff's left leg, normal right leg veins, no evidence of active phlebitis or other disease, and no

evidence of remote or recent pulmonary emboli.  (Tr. 290-93).  Plaintiff also presented to the

Diagnostic Clinic in October and December 2008, and in January and February 2009, with

complaints of, *inter alia*, headaches, anxiety, and gastrointestinal issues.  (Tr. 263-94).

From August 2010 to April 2011 plaintiff presented to the Cardiology Center of Amarillo

---

[1] Plaintiff was primarily seen by Peter Jones, a nurse practitioner, with Dr. Darter occasionally electronically signing the medical record at a subsequent date.

[2] Inflammation of a vein.

[3] Blockage of a pulmonary artery in the lungs primarily caused by a blood clot that travels to the lungs from the legs.

with complaints of chest pain, erratic heartbeat, shortness of breath, high blood pressure, and edema. (Tr. 298-328, 464, 612-17).

The medical records summarized above reflect plaintiff reported to her physicians a history of deep vein thrombosis (DVT) in her left leg and blood thinner (Coumadin) therapy for over 20 years.[4]  Medical records in 2008 and 2010 reflected evidence of a prior DVT in plaintiff's lower left leg, no evidence of a prior DVT in plaintiff's lower right leg, and no evidence of active phlebitis or disease or current DVT in her lower extremities.  (Tr. 290-93, 256, 298, 307).  The medical records confirmed continued treatment with Coumadin despite a physician's directive to discontinue Coumadin.  (Tr. 292).  The medical records, including the limited records of Dr. Darter, do not document recurrent or chronic swelling or pain in plaintiff's lower extremities, nor did they direct plaintiff to elevate her legs or instruct her to undergo any other course of treatment for excessive leg swelling or pain.  From January 2008 through June 2009 (the relevant time period), tests to determine the effectiveness of plaintiff's anticoagulant medication Coumadin often reflected levels below the desired range of 2.0 to 2.5 for basic "blood-thinning" needs.  (Tr. 254, 258, 292, 350, 353, 354, 360, 363, 366, 370, 374, 376, 382, 385, 387, 398, 404, 406, 422, 546, 548, 565).  Numerous other tests reflected a within-level or above-level range.

On September 17, 2010, plaintiff filed an application for disability benefits alleging she became unable to work on October 1, 2001 due to venous reflux disease, deep vein thrombosis (DVT) in her legs, high blood pressure, heart disease, asthma, irritable bowel syndrome, depression, and migraines.  (Tr. 162-63, 184).  On September 22, 2010, plaintiff amended her application to reflect she became unable to work on January 1, 2005, as a result of her disabling condition.  (Tr.

---

[4]Plaintiff indicates in her brief that any additional impairments "are not particularly relevant for purposes of this appeal." *Plaintiff's Brief*, at 2.

166-67).

In a Function Report completed October 16, 2010, plaintiff reported a history of DVT in her legs, and indicated her legs swell after roughly 20 minutes causing severe pain.[5]  Plaintiff also reported bilateral arm pain as a result of tendinitis.  (Tr. 200).  Plaintiff described her daily activities as tending to her personal hygiene, occasionally cooking breakfast and dinner,[6] reading, watching television, and attempting to walk for 30 minutes every day.  (Tr. 201, 202).  Plaintiff indicated she lives with her husband, does the laundry and some cleaning, and cares for pets with her husband's assistance.  Plaintiff stated her leg condition affects her ability to stand, walk and concentrate, and her sleeping is affected by sleep apnea.  Plaintiff indicated she is able to feed herself, but that her leg condition affects her ability to dress, bathe, and use the toilet, that the tendinitis in her arms affects her ability to care for her hair, and that she uses notes to remind herself to take care of personal needs, grooming and taking medications.  (Tr. 202).  Plaintiff indicated she goes outside daily, travels either by driving or riding in a car, can go places alone, shops in stores about once a month, and shops online.  Plaintiff reported she talks with others on the phone and in person, and regularly attends weekly church services and sporting events in which her grandchildren compete.  Plaintiff indicated social activities make her anxious and frustrated.  (Tr. 203, 204, 205).

Plaintiff's reported hobbies include reading, bible study, watching television, camping, and hiking, although she can no longer hike as a consequence of her legs swelling and hurting.  (Tr. 204).  Plaintiff reported all exertional activities are affected by her condition, that she can only lift

---

[5]Plaintiff did not indicate if she was reporting symptoms during the relevant benefit period (January 2008 - June 2009) or at the time she made the report in October 2010.

[6]Plaintiff indicated she used to cook "all the time" but, as a consequence of her condition,  now prepares meals only once or twice per week, typically in the form of sandwiches, frozen dinners, and easily prepared meals and that preparation of meals takes her 1½ to 2 hours.  (Tr. 202).

20 pounds, must rest after walking short distances, cannot stand for long durations, uses a walker when required to walk extensively, and utilizes motorized shopping carts in stores if provided.  (Tr. 206).

Plaintiff reported she can pay bills, count change and use a checkbook, but that she has difficulty counting change due to dyslexia.  (Tr. 203).  Plaintiff reported difficulty paying attention and completing tasks as a consequence of Attention Deficit Hyperactivity Disorder, although she indicates she prefers spoken instruction opposed to written instruction because of a greater ability to stay focused with spoken instruction.  (Tr. 205-06).

On November 16, 2010, the Social Security Administration (SSA) denied plaintiff benefits based on a primary diagnosis of anxiety related disorders and a secondary diagnosis of deep venous thrombosis.  (Tr. 83).  The SSA noted plaintiff claimed she was disabled because of venous reflux disease, deep vein thrombosis, high blood pressure, heart disease, asthma, irritable bowel disease, depression and migraines, but found the evidence was not sufficient to show her conditions were disabling prior to June 30, 2009, her last date insured.  (Tr. 87).

In a Disability Report completed February 17, 2011, plaintiff reported her legs were hurting worse and swelling more often as of January 2011.[7]  (Tr. 210).  Plaintiff reported she could not lift over 10 pounds per doctor's orders due to a "twisted vein" in her leg.  Plaintiff reported constant pain and an inability to do any normal daily activities.  (Tr. 214).

On April 7, 2011, the SSA again denied plaintiff benefits on reconsideration.  The SSA again noted plaintiff claimed she was disabled due to deep venous thrombosis, high blood pressure, heart disease, asthma, irritable bowel syndrome, migraines, and depression but found the evidence

---

[7]Again, the relevant time period in this case is January 2008 - June 2009.

was not sufficient to show her conditions were disabling prior to June 30, 2009 when her period of coverage ended. (Tr. 84, 93).

In a Disability Report completed April 26, 2011, plaintiff reported her heart medicine had been increased, that she had broken her right foot which required her to wear a support boot and keep her right leg elevated, and that her legs "hurt all the time." (Tr. 216). Plaintiff reported it was hard for her to care for her personal needs because she has trouble lifting her arms due to pain, cannot walk very well due to pain and swelling in her legs, and has problems breathing. (Tr. 219).

On December 1, 2011, an Administrative Law Judge (ALJ) held an administrative hearing. (Tr. 24-82). At the hearing, petitioner amended her alleged onset date to January 9, 2008 to correlate with the medical evidence of record. (Tr. 27, 233). At the time of the hearing, plaintiff was 52 years of age. (Tr. 32). She testified she was a high school graduate with "some college," and had past relevant work as a house cleaner, hotel maid, a cashier, a cook, a store greeter, and secretarial work. (Tr. 34-38; 184-85). Plaintiff testified she last worked in 2004 as a house cleaner but quit working because the pain caused by extreme swelling in her legs prohibited her from standing for any period of time. (Tr. 39). Plaintiff testified her legs swell if standing, sitting with her legs "hanging down" and, in actuality, swell "all the time," her left leg more than her right leg. (Tr. 40). Plaintiff testified the swelling in her legs cause her severe pain, and that "they" told her to elevate her legs any time she is sitting. (Tr. 41). Plaintiff testified that sometimes elevating her legs while sitting is not sufficient to reduce the swelling and she has to lie down and elevate her legs above her heart. Plaintiff explained she has to lie down at least twice a day on most days for about an hour each time, especially if she stands any amount of time. (Tr. 41-42, 69). Plaintiff opined that she could not do a sedentary job, eight hours a day, five days a week, because she would have to sit with her legs down and could not recline. (Tr. 43). Plaintiff testified her doctors have told her to

keep her legs elevated and that on an average day, she does as "[l]ittle as possible" and that daily

chores take a long time to complete because she has to repeatedly sit down.  (Tr. 55-56).  Plaintiff

estimated that she can probably sit for 30 minutes before her legs begin to swell and she has to lie

down and elevate her legs above her heart. (Tr. 57).  Plaintiff estimated she can walk half a block

before having to stop because of swelling and pain in her legs.  (Tr. 58).  Plaintiff testified she is

often at a doctor's office several times a week, mostly having her Coumadin levels checked, that she

spends a lot of time on the road traveling to and from the doctors' offices, and that her daughter

usually drives her to the doctors' visits.  (Tr. 61-62).  Plaintiff testified she drove herself to the

hearing in Fort Worth, Texas.  (Tr. 64).

Plaintiff testified she "might" be able to perform a job that has an option of alternating

between sitting and standing if she could elevate her legs while sitting.  (Tr. 69).  Plaintiff stated,

however, that she did not believe elevation of her legs at only stool height would be sufficient to

prevent swelling, and that she would not be able to perform such a job eight hours a day/five days a

week at the lower elevation level.  (Tr. 69-70).  Plaintiff estimated respiratory infections and

headaches keep her bedridden at least seven (7) days per month.  (Tr. 70).  Questioning of plaintiff

and her testimony in response was not specifically limited to the relevant time period of January

2008 to June 2009.

A vocational expert (VE) was asked to consider a hypothetical person with plaintiff's skill

set and work history, who is limited to light or sedentary work with a sit/stand option in an indoor

temperature-controlled work environment, and is restricted to only occasional postural movements,

no stooping, kneeling, crouching, or crawling, no climbing of ladders, ropes or scaffolding, no work

around hazards such as heights or dangerous moving machinery, no concentrated exposure to dust,

fumes or chemicals, and limited to simple tasks.  In response, the VE testified such a person could

not perform plaintiff's past relevant work as a maid, janitor, cashier, cook, greeter, or secretary.  (Tr. 71-72).  The VE testified such a person could, however, perform the light jobs of office helper, information/office clerk, small parts assembler, packager, and scheduler, or the sedentary jobs of office helper and receptionist.  (Tr. 72-75).  The VE testified that if such a person needed to lie down and recline for a period of time longer than the standard break, or if such a person had unscheduled absences of more than twice per month, there would not be any jobs that person could perform.  (Tr. 75-76).  The VE testified that if such a person had the additional restriction that her legs be elevated at stool level at all times while sitting, she could perform the sedentary jobs without any problem and could perform the light jobs to the extent the legs could be elevated while sitting.  (Tr. 76-77).  The VE testified that if such a person were required to elevate their legs above stool-level, performance of either the sedentary or light jobs identified would be "a little more difficult" and would not easily work.  (Tr. 77).

On December 15, 2011, plaintiff's representative submitted a post-hearing brief setting forth a case theory, argument and a summary of the medical evidence of record by date.  (Tr. 225-32).  Also on December 15, 2011, one of plaintiff's treating physicians, Dr. Darter, completed a medical source statement form generated by plaintiff's non-attorney legal representative.  On that form, Dr. Darter indicated plaintiff's impairments do not affect her ability to sit but that plaintiff's legs must be elevated at waist level frequently for up to 15 minutes at a time.  Dr. Darter found plaintiff's impairments limit her standing and walking time at a job to less than 2 hours per work day, interfere with her ability to concentrate and focus, and could expect to cause plaintiff to miss more than four (4) days of work per month.  (Tr. 236).

On January 5, 2012, plaintiff's representative submitted an addendum to her post-hearing brief, attaching the December 15, 2011 "Medical Source Inquiry" completed by Dr. Darter.  (Tr.

234-36).

On March 7, 2012, the ALJ rendered an unfavorable decision finding plaintiff not disabled and not under a disability as defined by the Social Security Act at any time from the amended onset date of January 9, 2008 through June 30, 2009, the date plaintiff was last insured. (Tr. 11-19). The ALJ found plaintiff had not engaged in substantial gainful activity during the period from her original alleged onset date of January 1, 2005 (the second alleged onset date) through June 30, 2009, her date last insured. (Tr. 13). The ALJ determined plaintiff had the following severe impairments: venous incompetency, chronic recurrent upper respiratory infections/asthma, gastroenteritis, migraine headaches, sleep apnea, obesity, and anxiety disorder. (Tr. 13). The ALJ determined plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526). (Tr. 14). The ALJ found that through the date last insured, plaintiff had the residual functional capacity (RFC) to lift and/or carry 20 pounds occasionally and 10 pounds frequently; to stand and/or walk for 6 hours in an 8-hour workday and sit for 6 hours in an 8-hour workday; to occasionally balance, kneel, and crawl; and to perform detailed, but not complex, job tasks. (Tr. 15). The ALJ also found plaintiff required the option to sit or stand at will, must work in a temperature-controlled work environment indoors, and must avoid hazards such as unprotected heights, dangerous moving machinery, and concentrated exposure to dust, fumes, and chemicals. (Tr. 15). Based upon the VE's testimony, the ALJ found plaintiff unable to perform her past relevant work as a maid. (Tr. 17). Utilizing VE testimony, the ALJ determined that through the date last insured, and considering plaintiff's RFC, age, education, and work experience, plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the regional and national economies identifying the light level jobs of information clerk or office

helper, and the job of office helper at the sedentary level as work plaintiff could perform.  (Tr. 17).

On January 29, 2013, the Appeals Council denied plaintiff's request for review rendering the

ALJ's March 7, 2012 decision as the Commissioner of Social Security's final administrative

decision.  (Tr. 1-3).  Plaintiff now seeks judicial review of the denial of benefits pursuant to 42

U.S.C. § 405(g).

## II.
## STANDARD OF REVIEW

In reviewing disability determinations by the Commissioner, this court's role is limited to

determining whether substantial evidence exists in the record, considered as a whole, to support the

Commissioner's factual findings and whether any errors of law were made.  *Anderson v. Sullivan*,

887 F.2d 630, 633 (5th Cir. 1989).  Substantial evidence is "such relevant evidence as a responsible

mind might accept to support a conclusion.  It is more than a mere scintilla and less than a

preponderance."  *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).  To determine whether

substantial evidence of disability exists, four elements of proof must be weighed:  (1) objective

medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) claimant's

subjective evidence of pain and disability; and (4) claimant's age, education, and work history.

*Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94

(5th Cir. 1972)).  If the Commissioner's findings are supported by substantial evidence, they are

conclusive, and the reviewing court may not substitute its own judgment for that of the

Commissioner, even if the court determines the evidence preponderates toward a different finding.

*Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980).  Conflicts in the evidence are to be

resolved by the Commissioner, not the courts, *Laffoon v. Califano*, 558 F.2d 253, 254 (5th Cir.

1977), and only a "conspicuous absence of credible choices" or "no contrary medical evidence" will

produce a finding of no substantial evidence.  *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

Stated differently, the level of review is not *de novo*.  The fact the ALJ *could* have found plaintiff to

be disabled is not the issue.  The ALJ did not do this, and the case comes to federal court with the

issue being limited to whether there was substantial evidence to support the ALJ's decision.

III.
ISSUES

The ALJ found plaintiff not disabled at Step Five of the five-step sequential analysis.

Consequently, the Court is limited to reviewing only whether there was substantial evidence in the

record taken as a whole to support a finding that plaintiff had the ability to perform other work that

exists in significant numbers in the regional and national economies, and whether proper legal

standards were applied in making that determination.  Plaintiff presents the following issues for

review:

1.      Whether the ALJ erred in giving little weight to Dr. Darter's opinion as to
        plaintiff's functional capacity; and

2.      Whether there is a legitimate medical basis for the ALJ's RFC finding.

IV.
MERITS

Consideration of Dr. Darter's Opinion

On December 15, 2011, two and a half years after the expiration of the benefit period which

ended June 30, 2009, and after the administrative hearing but prior to the ALJ's decision, Dr. Darter

completed a "Medical Source Inquiry" form provided by plaintiff's non-attorney legal

representative.  On that "check the box" form, Dr. Darter opined plaintiff's impairments did not

affect her ability to sit but that when sitting, it was medically necessary for plaintiff to elevate her

legs frequently (hourly) for up to 15 minutes at a time at a waist level degree of elevation (as in legs

being fully extended in front of her).  Dr. Darter opined plaintiff's impairments limit her standing

and/or walking to less than 2 hours per work day, explaining plaintiff can only stand/walk

continuously for half of a block without pain or limits.  Dr. Darter also opined plaintiff's symptoms

or medication likely interfere with her ability to concentrate and focus, and could likely result in

absenteeism from work in an amount of more than 4 days per month.  Dr. Darter also opined the

above limitations applied to the time frame of January 9, 2008 through December 15, 2011, the date

the form was completed.  (Tr. 236).  Although the form did not specifically ask about plaintiff's

impairments, Dr. Darter did not identify the impairments he contended would result in the

functional limitations he set out, nor did he indicate the medical cause of such impairments.

On March 7, 2012, the ALJ found plaintiff was not disabled and denied disability benefits.

The ALJ found that after careful consideration of the entire record, plaintiff, through June 30, 2009

(the date last insured), had the RFC to perform light work (to wit:  that plaintiff could lift and/or

carry 20 pounds occasionally and 10 pounds frequently, and stand and/or walk for 6 hours and sit

for 6 hours in an 8-hour workday), with the option to sit or stand at will.  The ALJ stated he

considered all of plaintiff's symptoms and the extent to which these symptoms could reasonably be

accepted as consistent with the objective medical evidence and other evidence, and also considered

opinion evidence as required by the Code of Federal Regulations and applicable Social Security

Rulings.  (Tr. 15).  The ALJ, identifying Dr. Darter as plaintiff's then "primary care physician,"

specifically noted the doctor's December 2011 medical source statement that plaintiff could not

perform even sedentary work activity, and that her symptoms affect her ability to focus and

concentrate, and would result in absenteeism of more than four days per month.[8]  After reviewing all of the evidence, including the hearing testimony, the ALJ gave "little weight" to the opinion of Dr. Darter, finding his opinion was "inconsistent with the evidence of record." (Tr. 16).  The ALJ explained Dr. Darter's opinion was "quite conclusory, providing very little explanation of the evidence relied on in forming that opinion" and was "without substantial support from the other evidence of record, which obviously renders it less persuasive." (Tr. 17).  The ALJ concluded plaintiff's RFC for light work was supported by:  (1) plaintiff's testimony in light of her medical treatment history, (2) the medical signs and findings, including testing showing only mild concentric left ventricular hypertrophy and an ejection fraction of 60% to 65%, only mild venous insufficiency in plaintiff's left leg and normal veins in her right leg, no intracranial abnormalities, and only moderate obstructive sleep apnea, (3) notes from a November 2011 examination showing plaintiff's lungs were clear to auscultation and that she had a regular heart rate and rhythm, and (4) plaintiff's stated activities of daily living.  (Tr. 17).

Plaintiff initially argues the ALJ committed an error of law by failing to give adequate weight to the "Medical Source Inquiry Form" completed by Dr. Darter in December 2011.  Plaintiff argues Dr. Darter's opinion was uncontradicted, was supported by the medical evidence of record, and was consistent with a finding of disability.  Plaintiff contends that had the ALJ given "significant weight" to Dr. Darter's opinion, or limited plaintiff to sedentary work, an award of benefits for most of the time period at issue would have been required as a matter of law.  In sum, plaintiff argues the ALJ erred in giving "little weight" to Dr. Darter's opinion, in failing to perform the analysis of Dr. Darter's opinion as is required by the regulations, and for failing to more

---

[8]The ALJ also noted the opinion evidence of the state agency medical consultant that there was insufficient evidence to establish a mental impairment, giving such opinion "little weight" as it was "inconsistent with the evidence of record."

specifically explain why he gave "little weight" to Dr. Darter's opinion.  Plaintiff maintains the

ALJ's bare explanations give no specifics, lack detail, are virtually meaningless boilerplate, are

unsupported by case-specific substantive analysis, and violate the SSA regulations.

Under SSA regulations, the ALJ will always consider medical opinions, *i.e.*, statements from

physicians that reflect judgments about the nature and severity of the claimant's impairments,[9] with

the rest of the relevant evidence received.  20 C.F. R. § 1527(a)(2), (b) (2012).  If any of the

evidence, including any medical opinions, is inconsistent with other evidence or is internally

inconsistent, the ALJ will weigh all of the evidence.  20 C.F.R. § 1527 (c) (2012).  Every medical

opinion received is evaluated.  20 C.F.R. § 1527(d) (2012).  The medical opinion of a *treating*

source[10] will be given "controlling weight" if it is well-supported by the medical evidence and is not

inconsistent with the other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2).  When a

treating source's opinion is not given "controlling weight," an ALJ will consider the following

factors in deciding what weight to give to the treating source's opinion:  (1) the length of the

treatment relationship and the frequency of examination, (2) the nature and extent of the treatment

relationship, (3) the extent to which the opinion is supported by other evidence, (4) the consistency

of the opinion with the record as a whole, (5) the doctor's specialization, and (6) other relevant

factors.  *Id.*  The ALJ must give specific, "good reasons" in his decision for the weight given to a

treating source's opinion, and the reasons must be supported by the evidence in the case record.  *Id*.;

SSR 96-2p, 1996 WL 374188 at *4-5.  An ALJ may give "little or no weight" to a treating

---

[9]Including the claimant's symptoms, diagnosis and prognosis, what the claimant can still do despite impairments, and the claimant's physical restrictions.

[10]A treating source is defined as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. §§ 404.1502, 416.902.  A treating source is the medical source most likely to be able to provide a detailed, longitudinal picture of the claimant's medical impairments.

physician's opinion "when good cause is shown." *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir.

2000). Good cause for rejecting a medical opinion is shown when the treating physician's evidence

is (1) conclusory, (2) unsupported by medically acceptable clinical, laboratory, or diagnostic

techniques, or (3) is otherwise unsupported by the evidence. *Id.* A treating physician's opinions are

not conclusive, and the ALJ may "reject the opinion of any physician when the evidence supports a

contrary conclusion." *Id.* at 455.

Here, the ALJ set out the reasons for the weight he gave Dr. Darter's December 2011

opinion as to plaintiff's limitations. The ALJ specifically stated he gave "little weight" to Dr.

Darter's functional assessment because it was "inconsistent with the evidence of record,", was

"quite conclusory," provided "very little explanation of the evidence relied on in forming that

opinion," and was "without substantial support from the other evidence of record." The ALJ, noting

he had reviewed all of the evidence, including the hearing testimony, found Dr. Darter's functional

assessment "less persuasive" based on the reasons recited above. While terse, the ALJ's

explanation constitutes "good cause" for giving Dr. Darter's opinions limited or no credence. *Cf.*

*Brock v. Astrue*, 2011 WL 4348305 (N.D. Tex. Sept. 16, 2011). On the form, Dr. Darter did not

include any explanation, analysis, or justification of how he reached his opinions. Moreover, the

ALJ provided a detailed analysis of the medical evidence prior to addressing the weight he

attributed to Dr. Darter's opinion. The objective medical evidence during and after the relevant

time period reflected plaintiff did not have disabling DVT during the time period at issue.

Presumably, DVT was the basis for Dr. Darter's opinion that plaintiff would need to elevate her legs

to waist level on an hourly basis. In support of his conclusion that plaintiff had the RFC for light

work, the ALJ cited: (1) plaintiff's testimony in light of her medical treatment history, (2) the

medical signs and findings, including testing showing only mild concentric left ventricular hypertrophy and an ejection fraction of 60% to 65%, only mild venous insufficiency in plaintiff's left leg and normal veins in her right leg, no intracranial abnormalities, and only moderate obstructive sleep apnea, (3) notes from a November 2011 examination showing plaintiff's lungs were clear to auscultation and that she had a regular heart rate and rhythm, and (4) plaintiff's stated activities of daily living. (Tr. 17). The ALJ met the "good cause" requirement in reaching his decision for the weight he gave Dr. Darter's opinion and for the RFC finding he made.

Plaintiff also contends the ALJ reversibly erred because he "provided no specific analysis" of any of the section 404.1527 factors in his decision. In *Newton v. Apfel*, the Fifth Circuit stated that "absent reliable medical evidence from a treating or examining physician controverting [a] claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Newton*, 209 F.3d at 453 (emphasis in original). The *Newton* requirement that an ALJ set forth his "detailed analysis" of each of the factors when refusing to give great weight to a treating physician's medical opinion is required only when there is *no* contradictory opinion of, findings of, or tests conducted by, another treating or examining physician. *Cf. Rollins v. Astrue*, 464 Fed. Appx. 353 (5th Cir. March 15, 2012); *Holifield v. Astrue*, 402 Fed.Appx. 24 (November 10, 2010). Plaintiff contends a detailed analysis of the factors was required in this case because there was no functional assessment contrary to Dr. Darter's opinion, thereby rendering it uncontradicted.

The ALJ, however, stated he considered the opinion evidence of Dr. Darter in accordance with the requirements of 20 C.F.R. § 404.1527 and found it was entitled to "little weight." The ALJ recited he did this based on a review of all the evidence and testimony, found Dr. Darter's functional

capacity opinion was "inconsistent" with the record, was "conclusory" in that it failed to explain, much less identify, any evidence relied on, and was "without substantial support" from any of the other evidence of record.  Plaintiff points out that although the ALJ stated Dr. Darter's opinion was unsupported by the other evidence, he did not mention any evidence to support his assertion, did not cite to any state agency doctor for support, mention any other experts, or call a medical expert to testify at the hearing.  Plaintiff contends the ALJ's failure to perform the detailed analysis was reversible error, as was his unsupported rejection of Dr. Darter's opinion.

Although case law does not specifically negate the "detailed analysis" requirement when a treating physician's opinion is conclusory and unsupported by any medical evidence in the record (although not necessarily *contradicted* by the medical evidence due to the lack of or absence of relevant evidence), the failure to include such an analysis under the circumstances of this case was not reversible error.  A detailed, step-by-step analysis of each factor, when the medical evidence of record did not afford any support for the treating physician's opinion (Factor 4) would be an exercise in futility.

Here, an analysis of the length of treatment, frequency of exam, and nature and extent of the treatment relationship (the first three factors) would have revealed plaintiff was treated by Dr. Thomas Darter at the CRMC on only three (3) occasions over five (5) years, to wit:  April 2005, May 2008, and June 2010.  More importantly, only the May 2008 examination was within the relevant time period in this case.  (Tr. 403-47, 453-61, 519-27).

On her first visit to Dr. Darter in April 2005, plaintiff presented with right lower quadrant abdominal pain.  Dr. Darter noted plaintiff's "history of deep vein thrombosis, recurrent," and that she was on Coumadin and had not had her levels checked in over three months.  Finding plaintiff's

levels to be low, Dr. Darter increased plaintiff's Coumadin dosages three days out of the week and ordered her levels be tested in a week.  (Tr. 453)

Over three years later, on her second visit to Dr. Darter in May 2008, plaintiff presented with nausea, vomiting, diarrhea, and weakness.  Dr. Darter noted plaintiff  "sees Peter Jones [[N.P]," has a history of left lower leg DVT, was "considered disabled" but "works at home," and was on Coumadin therapy.  Dr. Darter found no edema of plaintiff's extremities.  (Tr. 403-04).

On her third visit to Dr. Darter in June 2010, plaintiff presented with a left ankle sprain.  Dr. Darter noted some swelling and pain over the lateral aspect of the ankle.  (Tr. 519).

Plaintiff was also treated by Dr. Darter at the Fox Rural Health Clinic on three (3) occasions in May, July and September 2011, all of which were after the relevant time period in this case.  (Tr. 592-94, 604-06, 607-09).  In May 2011, plaintiff presented primarily with "pink" eye and cold symptoms, but also complained of right ankle pain and presented for a routine Coumadin checkup. Plaintiff reported her condition had been stable, reported no associated symptoms, and her Coumadin levels were within range.  Plaintiff was treated for her primary complaints, continued in a prescribed "boot" for previous injury, and given a refill of pain medication.  (Tr. 592-94).

In July 2011, plaintiff presented with a headache and for a routine Coumadin checkup. Plaintiff's Coumadin levels were within range and she was prescribed pain medication for her headache.  (Tr. 604-06).  In September 2011, plaintiff presented for a followup visit and routine Coumadin checkup.  Plaintiff reported she was doing well and Coumadin levels were within range. (Tr. 607-09).

While Dr. Darter served sporadically as a treating physician to plaintiff over several years, he personally treated her only once during the time period at issue (January 9, 2008 to June 30, 2009).

There is nothing in Dr. Darter's medical records indicating treatment for the lower extremity medical impairments plaintiff claims are disabling.  Further, Dr. Darter's limited medical records noted a history of DVT but did not document recurrent swelling or pain in plaintiff's lower extremities, nor did they direct plaintiff to elevate her legs or instruct any other course of treatment for leg swelling or pain.  There is no indication Dr. Darter is a specialist in an area relevant to plaintiff's alleged disabling condition and, importantly, there is no medical evidence generated by Dr. Darter which justifies any of the limitations set out in his December 2011 statement.  Similarly, Dr. Darter's functional limitation opinion is not consistent with the medical evidence as a whole.  While the record references occasional left leg edema or pain, it was typically in conjunction with another event such as a twisted ankle, a twisted knee, or wearing a walking boot, and was classified as mild.[11]  Tr. 256, 259, 299, 301-02, 306, 352, 366-70, 374, 398, 519, 585-94.  There were no objective medical findings regarding recurrent, painful, excessive swelling in plaintiff's lower extremities, much less <u>any</u> regular prescribed treatment for such a condition, including elevation of plaintiff's legs to any level, a prescribed frequency of elevation, or a prescribed elevation for an extended period of time.  Numerous tests conducted December 2007 through January 2011 to determine the effectiveness of plaintiff's anticoagulant Coumadin reflected a level below the desired range of 2.0 to 2.5 for basic "blood-thinning" needs, while several other tests during that time period reflected a within range or an above range level.  Citing the below-range test results, plaintiff argues Dr. Darter's December 2011 opinion that plaintiff would require regular leg elevation at above waist  level to combat any potential for lower extremity clotting, excessive swelling and extreme pain was well supported.  There is no

---

[11]The majority of the medical records indicating no edema.

evidence of record, however, from Dr. Darter or otherwise, which demonstrates that lower range

levels would result in debilitating swelling in plaintiff's legs.  The medical records also

confirmed plaintiff did not have DVT during the relevant time period, Tr. 290, 291, 307, 449,

and plaintiff's venous insufficiency in the left leg was described as mild.[12]  Tr. 291.  As noted by

the ALJ, the record also contained claimant's statements as to her activities of daily life which

were inconsistent with the limitations set forth by Dr. Darter.  A detailed evaluation of the factors

would have supported the limited weight the ALJ gave to Dr. Darter's opinion.

At Step 4, the ALJ found plaintiff had the RFC to lift and/or carry 20 pounds occasionally

This Court does not find the failure to provide a detailed analysis of the section 404.1527

factors in the decision was reversible error.  The ALJ indicated he considered each factor when

considering the opinion evidence, and gave "good reasons" in his decision as to the amount of

weight he gave to the treating physician's opinion.[13]  The Court finds no legal error sufficient to

reverse the ALJ's decision.  Plaintiff's claim should be denied.

## ALJ's RFC Determination

At Step 4, the ALJ found plaintiff had the RFC to lift and/or carry 20 pounds occasionally

and 10 pounds frequently; stand and/or walk for 6 hours in an 8-hour workday, and sit for 6

---

[12]After the pertinent period, plaintiff's venous insufficiency appears to have been remedied in part by vein ablation techniques.  Tr. 613.

[13]An ALJ need not explain in his written determination all evidence contained in the record.  *See McFadden v. Astrue,* 465 Fed. Appx. 557, 559 (7th Cir. 2012) ("an ALJ may not ignore entire lines of evidence contrary to the RFC determination but she need not discuss every piece of evidence in the record") (citing *O'Connor-Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir. 2010)); *Kornecky v. Commissioner of Social Security,* 161 Fed. Appx. 496, 507-08 (6th Cir. 2006) (*quoting Loral Defense Systems-Akron v. NLRB,* 200 F.3d 436, 453 (6th Cir. 1999) (holding an ALJ can consider evidence without directly addressing it); *NLRB v. Beverly Enterprises-Massachusetts,* 174 F.3d 13 (1st Cir. 1999) ("an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *NLRB v. Katz's Delicatessen of Houston St., Inc.,* 80 F.3d 755, 765 (2nd Cir. 1996) (ALJ may resolve credibility disputes implicitly rather than explicitly where his "treatment of the evidence is supported by the records as a whole"); *Penalver v. Barnhart,* No. SA-04-CA-1107-RF, 2005 WL 2137900, at *6 (W.D. Tex. July 13, 2005) ("The ALJ may not have discussed all of the evidence in the record to the extent desired by Plaintiff, but the ALJ is only required to make clear the basis of his assessment-he need not discuss all supporting evidence or evidence rejected."); *Jefferson v. Barnhart,* 356 F. Supp. 2d 663, 675 (S.D. Tex. Mar. 12, 2004) ("in interpreting the evidence and developing the record, the ALJ need not discuss every piece of evidence").

hours in an 8-hour workday.  The ALJ further found plaintiff required the option to sit or stand at will; can occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds; can occasionally balance, kneel, stoop, crouch, and crawl; must avoid hazards (such as unprotected heights and dangerous moving machinery); must work in an indoor, temperature-controlled work environment; and can perform detailed, but not complex, job tasks.  (Tr. 15).  Plaintiff argues there was no legitimate medical basis to support this RFC finding by the ALJ, noting there was no functional assessment other than Dr. Darter's assessment.  Plaintiff concludes the ALJ improperly invented the RFC finding "out of whole cloth."

In making the RFC finding, the ALJ noted he considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, including opinion evidence, which was also considered.  (Tr. 15). The medical record confirmed plaintiff had a history of DVT and mild venous incompetency in her left leg, recurrent respiratory and gastrointestinal issues, and anxiety issues over her health. There are no medical records restricting plaintiff's ability to lift, sit, and/or carry, climb, balance, kneel, stoop, crouch, or crawl.  Plaintiff's testimony indicated she needed to be able to sit and stand at will and, although she later qualified her testimony, that she believed she "might" be able to perform such a job if she could elevate her legs while sitting, even though she believed elevation of her legs at only stool height would not be sufficient to prevent swelling.  Plaintiff also stated she could walk limited distances.  The ALJ found plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with the stated RFC.  As noted by the ALJ, plaintiff's described daily activities were not limited to the extent one would expect, given her complaints of disabling

symptoms and limitations, noting plaintiff indicated she could dress, bathe, care for her hair, feed herself, use the bathroom without assistance, prepare meals, wash laundry, clean, shop in stores, and drive.  (Tr. 16).

While the ALJ's interpretation of plaintiff's testimony regarding her abilities is more liberal than this Court might have found, those determinations are within the ALJ's province and are not subject to a *de novo* review by this Court.  The ALJ has the sole responsibility for determining a claimant's disability status.  The ALJ's decision reflects he considered and evaluated all of the medical evidence of record in addition to statements made by plaintiff during both the application process and the administrative hearing.  The ALJ appropriately weighed the medical source opinions of record, provided good cause for the amount of weight afforded each, and set forth adequate reasoning for his findings.  The medical records appear to be consistent with, if not less restrictive, that the ALJ's RFC finding.  The Court finds there is substantial evidence in the administrative record to support the ALJ's finding as to plaintiff's RFC.  To the extent plaintiff asserts the ALJ's RFC is not supported by the evidence, plaintiff's claim should be denied.

V.

RECOMMENDATION

It is the recommendation of the undersigned United States Magistrate Judge to the United States District Judge that the decision of the defendant Commissioner finding plaintiff not disabled and not entitled to a period of benefits be AFFIRMED.

VI.
INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Report and

Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED this __11th__ day of September 2014.


_____
CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE


**\* NOTICE OF RIGHT TO OBJECT \***

Any party may object to these proposed findings, conclusions and recommendation.  In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line.  Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(c), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E).  **Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed** as indicated by the "entered" date. *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation."  Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties.  A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court.  *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1), *as recognized in ACS Recovery Servs., Inc. v. Griffin*, 676 F.3d 512, 521 n.5 (5th Cir. 2012); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).